## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF TEXAS
## BEAUMONT DIVISION

| | | |
|---|---|---|
| JANE DOE (CH), | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. _____ |
| | § | |
| G6 HOSPITALITY, LLC | § | |
| G6 HOSPITALITY IP, LLC | § | |
| G6 HOSPITALITY PROPERTY, LLC | § | |
| G6 HOSPITALITY PURCHASING, LLC | § | |
| G6 HOSPITALITY FRANCHISING, LLC | § | |
| MOTEL 6 OPERATING, L.P., and | § | |
| ALLIANCE LAUNDRY SYSTEMS LLC, | § | |
| | § | |
| Defendants. | § | |
| | § | |
| | § | |
| | § | |

### PLAINTIFF JANE DOE (CH)'S ORIGINAL COMPLANT

Plaintiff JANE DOE (CH) (hereinafter "Plaintiff" or "Jane Doe (CH)"), in the above-styled and numbered cause, files this Original Complaint against Defendants G6 HOSPITALITY, L.L.C.; G6 HOSPITALITY IP, LLC.; G6 HOSPITALITY PROPERTY, LLC.; G6 HOSPITALITY PURCHASING, LLC.; and G6 HOSPITALITY FRANCHISING, LLC.; MOTEL 6 OPERATING, L.P. (hereinafter "G6 Defendants" or "G6") as well as Defendant ALLIANCE LAUNDRY SYSTEMS LLC (hereinafter "Franchisee"), and respectfully pleads to the Court and jury as follows:

### SUMMARY

1.      Jane Doe (CH) is a survivor of sex trafficking who was trafficked from approximately 2015 through approximately 2017.

2.      Jane Doe (CH) was trafficked at the Motel 6 located at 1125 N. Schmeer Rd, Portland, Oregon 97217 (hereinafter "Portland Motel 6")

3.      Portland Motel 6 was managed, controlled, owned, and / or operated by G6 Defendants and Franchisee. Franchisee provided "boots on the ground" at Portland Motel 6, while G6 directly participated in and controlled relevant motel operations, including playing a central role in room rentals and through substantial involvement in aspects of operations related to the detection of, and response to, sex trafficking. Franchisee also acted as an agent of G6 when operating Portland Motel 6.

4.      As discussed herein, G6 Defendants and Franchisee derived financial benefits from widespread use of each motel for sex trafficking, including the trafficking of Jane Doe (CH). Despite obvious and apparent signs of sex trafficking at Portland Motel 6 for trafficking, G6 Defendants and Franchisee continued renting motel rooms to her trafficker and operated Portland Motel 6 in a way that enabled sex trafficking, including creation of a haven where traffickers could operate without disruption from motel staff and with minimal risk of detection and traceability.

5.      Jane Doe (CH) files this lawsuit under the Trafficking Victims Protection Reauthorization Act ("TVPRA"), 18 U.S.C. §1581, *et seq.*, for the harms and losses she suffered from the sex trafficking she experienced at Portland Motel 6, which G6 Defendants and Franchisee benefitted from (financial and otherwise) and facilitated as described in this Complaint.

6.      Jane Doe (CH) is a resident of Oregon. She may be contacted through her lead counsel, whose information is contained below.

7.      Due to the stigmatizing and sensitive nature of the allegations in this lawsuit, there is a collective, recognized, and compelling interest to not publicly reveal the identity of Jane Doe (CH), particularly as to Plaintiff's concerns of privacy, embarrassment, and safety.

8.    Defendant G6 HOSPITALITY LLC is a for-profit Delaware company with its principal place of business in Carrolton, Texas, which has answered and appeared herein.

9.    Defendant G6 HOSPITALITY, IP is a for-profit Delaware company with its principal place of business in Carrolton, Texas which has answered and appeared herein.

10.    Defendant G6 HOSPITALITY PROPERTY, LLC is a for-profit Delaware company with its principal place of business in Carrolton, Texas which has answered and appeared herein.

11.    Defendant G6 HOSPITALITY PURCHASING, LLC is a for-profit Delaware company with its principal place of business in Carrolton, Texas which has answered and appeared herein.

12.    Defendant G6 HOSPITALITY FRANCHISING, LLC is a for-profit Delaware company with its principal place of business in Carrolton, Texas which has answered and appeared herein.

13.    Defendant MOTEL 6 OPERATING, L.P. is a for-profit Delaware company with its principal place of business in Carrolton, Texas, which has answered and appeared herein.

14.    Defendant ALLIANCE LAUNDRY SYSTEMS, LLC is a Wisconsin Corporation. Upon information and belief, Defendant ALLIANCE LAUNDRY SYSTEMS, LLC has a registered agent with Anthony J. Motschenbacher (whose address is at 117 SW Taylor St. Ste 300, Portland, OR 97204) and Jay Klimar Patel (whose address is at 4512 SE 82nd Ave. Portland, OR 97266).

## JURISDICTION AND VENUE

15.    This Court has original jurisdiction pursuant to 28 U.S.C. § 1331 because this action involves a federal question under the TVPRA.

- 3 -

16.    Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(1) because, pursuant to 28 U.S.C. §§ 1391(c)(2) and 1391(d), at least one Defendant is a resident of the Eastern District of Texas, and each Defendant resides in the State which the district is located.

17.    Defendants G6 HOSPITALITY LLC, G6 HOSPITALITY IP, LLC, G6 HOSPITALITY PROPERTY, LLC, G6 HOSPITALITY PURCHASING, LLC, G6 HOSPITALITY FRANCHISING, LLC, and MOTEL 6 OPERATING, L.P. have the same principal place of business, which is in Carrolton, Texas, within the Eastern District of Texas. Therefore, each is a resident of the Eastern District of Texas for the purpose of § 1391(b)(1).

18.    Under 28 U.S.C. §§ 1391(d), Franchisee is a resident of Texas for the purpose of § 1391(b)(1) because if the Eastern District of Texas were a separate state, Franchisee's contacts with the district would be sufficient to subject it to personal jurisdiction.

19.    Venue is also proper in this Court pursuant to 28 U.S.C. § 1391(b)(2) as a substantial part of the events or omissions giving rise to the claim occurred in the Eastern District of Texas.

20.    Each of G6 Defendants participated in a joint venture operating Motel 6 from a central location at the G6 corporate offices in Carrolton, Texas, within the Eastern District of Texas. On information and belief:

    a.  The relationship between G6 Defendants was centered at the G6 corporate offices in the Eastern District of Texas.

    b.  G6 Defendants signed agreements with one another related to Portland Motel 6 from G6 corporate offices in the Eastern District of Texas.

    c.  G6 Defendants exercised joint control over operations of Portland Motel 6 from a central location at G6 corporate offices in the Eastern District of Texas.

d.  G6 Defendants distributed revenue earned from Portland Motel 6 among themselves from G6 corporate offices in the Eastern District of Texas.

e.  G6 Defendants developed policies for Portland Motel 6 from G6 corporate offices in the Eastern District of Texas.

f.  G6 Defendants communicated with one another regarding operation of Portland Motel 6 from G6 corporate offices in the Eastern District of Texas.

21.    Plaintiff's claims against Franchisee arise out of Franchisee's contacts with Texas through Franchisee's relationship with G6 Defendants, which have their principal place of business in the Eastern District of Texas. Franchisee's participation in ventures with G6 Defendants operating Portland Motel 6 occurred, in substantial part, in Texas because:

a.  Upon information and belief, Franchisee actively sought out a franchising relationship by contacting the G6 Defendants in Texas.

b.  Franchisee acknowledged that the negotiation, execution, and acceptance of the franchising agreement occurred in the Eastern District of Texas.

c.  Franchisee agreed that the ongoing performance of the franchising agreement would take place, in part, in the Eastern District of Texas.

d.  The franchising agreement had a choice of law provision selecting the law of Texas as the governing law.

e.  The franchising agreement required Franchisee to report information to G6 Defendants in Texas, including information about all incidents involving safety, security, public relations, or serious injury to persons or property that occur at, or involve, Portland Motel 6, including those involving sex trafficking victims like Jane Doe (CH).

f.   Franchisee agreed to submit all notices required under the franchising agreement to G6 Defendants in the Eastern District of Texas.

g.   Franchisee was required to attend training and meetings in Texas.

h.   G6 Defendants dictated policies related to safety, security, human trafficking, employee training and response as well as other subjects from their principal place of business in the Eastern District of Texas.

i.   Franchisee had an ongoing obligation to participate in centralized programs operated by G6 Defendants from their principal place of business in the Eastern District of Texas.

j.   Franchisee was required to purchase insurance on behalf of one or more Texas entities (G6 Defendants).

k.   Upon information and belief, reservation information for rooms at Portland Motel 6 passed through a system operated and managed by G6 from its principal place of business in Texas.

l.   Upon information and belief, payment information for rooms at Portland Motel 6 passed through a system operated and managed by G6 in Texas.

m.  The benefits that Franchisee received from room rentals were governed by the Texas franchising agreement.

n.   Franchisee agreed to make all payments due under the franchising agreement at the G6 principal place of business in the Eastern District of Texas.

o.   Franchisee's operation of Portland Motel 6 was controlled and/or influenced by many policies set and enforced by G6 Defendants from their principal place of business in Carrollton, Texas.

p.  Franchisee signed a software licensing agreement with G6 Defendants for the property management software which Franchisee was required to use when operating the motels, including, but not limited to, room rentals, booking rooms at the motels, and processing payment for those rooms.

q.  Franchisee agreed to file any lawsuit arising from the licensing agreement in the Eastern District of Texas and waived personal jurisdiction and venue objections.

## SEX TRAFFICKING AND THE TRAFFICKING VICTIMS PROTECTION REAUTHORIZATION ACT

22.    Sex trafficking is a public health crisis in the United States. It is now widely recognized, including by Congress and many state legislatures, that combating sex trafficking requires more than just criminal penalties for pimps and sex buyers.

23.    In 2008, Congress, through the TVPRA, expanded the remedies available to survivors of sex trafficking. Congress recognized the need to extend liability beyond sex buyers and sellers and intentionally expanded the scope of the TVPRA to reach those who—while not criminally liable under the TVPRA—benefit from participation in ventures that facilitate sex trafficking.

24.    In the TVPRA, Congress adopted a broad definition of sex trafficking to "address the increasingly subtle methods of traffickers who place their victims in modern-day slavery."[1]

25.    The TVPRA defines sex trafficking as the recruitment, harboring, transportation, provision, obtaining, patronizing, or soliciting of a person for the purpose of causing the person to engage in a commercial sex act either (1) before the person turns 18 years old; or (2) through force, fraud, or coercion.[2]

---

[1] H.R. REP. NO. 106-939, at 101; 18 U.S.C. § 1591(e)(5).
[2] 18 U.S.C. § 1591(a)(2)

26.    Fraud includes any "deliberate act of deception, trickery or misrepresentation."[3]

27.    Coercion includes "threats of serious harm to or physical restraint against any person . . . any scheme, plan, or pattern intended to cause a person to believe that failure to perform an act would result in serious harm to or physical restraint against any person . . . or the abuse or threatened abuse of law or the legal process."[4]

28.    Serious harm refers to "any harm, whether physical or nonphysical, including psychological, financial, or reputational harm, that is sufficiently serious, under all the surrounding circumstances, to compel a reasonable person of the same background and in the same circumstances to perform or to continue performing commercial sexual activity in order to avoid incurring that harm."[5]

29.    Some victims are brought into trafficking through abduction or use of physical violence, while many other trafficking relationships begin with a false promise of a romantic relationship or financial security.[6] Traffickers often prey on individuals with vulnerabilities that make them more susceptible to coercion and control.[7]

30.    Traffickers then use a variety of techniques to maintain control over their victims. Some traffickers use physical violence and overt threats to control their victims, while others use more subtle forms of fraud and coercion.[8] Many traffickers use techniques to undermine victims' ability to think and act independently through repetitive infliction of psychological trauma. These

---

[3] *See, e.g., United States v. Bell*, 761 F.3d 900, 909 (8th Cir. 2014); *Joseph v. Signal Int'l*, 2015 U.S. Dist. LEXIS 33870, at *21-*22 (E.D. Tex. 2015).

[4] 18 U.S.C. § 1591(e)(2)

[5] 18 U.S.C. § 1591(e)(5)

[6] *See* The Exodus Road, *How Do Traffickers Lure Their Victims?*, January 10, 2024, https://theexodusroad.com/how-do-traffickers-lure-their-victims/ /.

[7] Polaris Project, *Sex Trafficking: The basics*, https://polarisproject.org/understanding-human-trafficking/ /; The Exodus Road, *How Do Traffickers Lure Their Victims?*, January 10, 2024, https://theexodusroad.com/how-do-traffickers-lure-their-victims/ /.

[8] The National Prevention Toolkit, *Sex Trafficking*, https://nationaltoolkit.csw.fsu.edu/leo/part-2/sex-trafficking /.

techniques can include high levels of control, exposure to chronic stress and threat, isolation. provocation of fear, and the creation of a sense of helplessness in victims.[9]

## FACTS

**I.    Jane Doe (CH) is a Victim of Sex Trafficking at a Motel Owned, Operated, Managed, and Controlled by Defendants.**

31.    Jane Doe (CH) is a victim of sex trafficking under 18 U.S.C. §1591(a) and §1595(a). Her trafficker used physical violence, psychological abuse and manipulation, a pattern of threatening and intimidating conduct, exploitation of financial dependence, and extreme restrictions on Jane Doe (CH)'s freedom, restraints on Jane Doe (CH)'s freedom of movement, isolation, and coercive control to require her to engage in commercial sex for their financial benefit, including at Portland Motel 6.

32.    Jane Doe (CH) first came under the control of one of her traffickers when she was 28 years old. Jane Doe (CH) met her trafficker at a bar. He offered to buy her drinks, but he "roofied" the drinks. Plaintiff lost consciousness and woke up in a hotel room, which started the trafficking.

33.    Plaintiff was only able to break free from her trafficking with help from a "john." Plaintiff's trafficker and / or affiliates chased her and shot at her, injuring her. She booked her hospital stay under a different name and was finally able to escape her trafficking.

34.    Plaintiff was trafficked at Portland Motel 6.

35.    Throughout her trafficking period, Jane Doe (CH)'s trafficker used various techniques to maintain control over her and to cause her to engage in commercial sex for his financial benefit.

---

[9] Elizabeth Hopper, Ph.D. & José Hidalgo, M.D., *Invisible Chains: Psychological Coercion of Human Trafficking Victims*, 1 Intercultural Hum. Rts. L. Rev. 185, 191 (2006).

a.  Plaintiff's trafficker psychologically and emotionally abused Jane Doe (CH) by constantly threatening her life or threatening her with physical abuse. These threats extended to Plaintiff's loved ones.

b.  Plaintiff's trafficker kept her confined in rooms, including Portland Motel 6 which she stayed.

c.  The trafficker's most frequent method of control over Jane Doe (CH) was physical abuse. On several occasions, Plaintiff's trafficker physically abused her in booked hotel rooms at Portland Motel 6.

d.  One of Plaintiff's preferred forms of physical abuse was choking. Plaintiff's trafficker would often choke her in the parking lot of Portland Motel 6.

e.  Plaintiff's trafficker would starve her, withholding her access to food and water.

f.  Plaintiff's trafficker forced dependence on him by withholding her identification documents, such as her driver's license, Photo ID, Social Security Card, and / or Passport.

g.  Plaintiff's trafficker was always next to Plaintiff, and if he was not, he made sure someone they trusted was around her.

h.  Plaintiff's trafficker used various technology devices on the occasions where he was not directly next to her, including using cameras, baby monitors, and / or phone devices.

i.  Plaintiff's trafficker managed her social media and would message her family and friends to make it seem like she was okay.

j.  Plaintiff's trafficker oversaw the phone that Plaintiff used to track her location, how many dates were booked, and / or how she used the phone.

k.  Plaintiff's trafficker engaged in a pattern of control, intimidating, and threatening behavior that caused Jane Doe (CH) to believe she would face serious harm or death if she did not comply with their demands, namely that she engage in commercial sex for their financial profit.

l.  Plaintiff's trafficker imposed strict rules on Jane Doe (CH)'s behavior and restrictions on her movements.

m.  Plaintiff's trafficker set quotas for her each day, and her trafficker weas the only ones allowed to collect the proceeds, limiting or foreclosing Jane Doe (CH)'s access to cash.

36.    Jane Doe (CH)'s trafficker kept her at Portland Motel 6. Jane Doe (CH)'s trafficker was intentional about this motel. He chose hotels or motels where they could operate without inference and while minimizing their risk of detection and traceability. This made Portland Motel 6 a prime candidate for Plaintiff's trafficking.

37.    Jane Doe (CH)'s trafficker used the control he maintained through the aforementioned described methods to require Jane Doe (CH) to engage in commercial sex at Portland Motel 6. Jane Doe (CH) was repeatedly harbored, maintained, provided, solicited, and forced to engage in commercial sex at Portland Motel 6

38.    During the period that she was trafficked at Portland Motel 6, Jane Doe (CH)'s trafficking had profound effects on her, including effects on her appearance, demeanor, movements, and her interactions with others. This manifested in signs of Jane Doe (CH)'s trafficking that were obvious and apparent to the staff and management at Portland Motel 6. These signs included nervous and fearful demeanor, signs of paranoia, disorientation, refusal to make eye contact, limited access to clothing, untreated health problems, inability to move around the motel

or communicate with others, submissive behavior with her trafficker, asking her trafficker for permission for basic things, letting her trafficker speak on her behalf, inability to provide logical responses to basic questions, lack of personal possessions, carrying possessions in a trash bag or plastic bag, signs of sleep deprivation, poor hygiene, etc. These signs, among others, match the "red flags"[10] of trafficking that the hotel industry and each Defendant recognized to be indicators of sex trafficking in a hospitality environment.

## II.    The Hotel Industry's Role in Sex Trafficking and Defendants' Knowledge of the Problem.

39.    The widely known and pervasive relationship between sex trafficking and the hotel industry cannot be disregarded and necessarily shapes what each Defendant knew or should have known regarding the trafficking at Portland Motel 6, including the trafficking of Jane Doe (CH).

40.    Today, sex slavery is pervasive in the United States, and both hotels and motels are the primary place where it happens.[11] For years, sex traffickers have been able to reap their profits with little risk when attempting to operate within hotels.[12] In 2014, 92% of calls received by the National Human Trafficking Hotline involved reports of sex trafficking taking place at hotels.[13] Hotels have been found to account for over 90% of the commercial exploitation of children.[14]

---

[10] These red flags are described in the "The Hotel Industry's Role in Sex Trafficking and Defendants' Knowledge of the Problem" section of this complaint.

[11] *See* Jaclyn Galucci, *Human Trafficking is an Epidemic in the U.S. It's Also Big Business*, Fortune, April 2019, https://fortune.com/2019/04/14/human-sex-trafficking-usslavery/ (citing Cindy McCain, chair of the McCain Institute's Human Trafficking Advisory Council).

[12] *See* Polaris Project, *Human Trafficking in the Hotel Industry*, Feb. 10, 2016, https://polarisproject.org/blog/2016/02/10/human-trafficking-motel-industry /; Eleanor Goldberg, *You Could Help Save A Trafficking Victim's Life With Your Hotel Room Pic*, Huffington Post, June 2016, http://www.huffingtonpost.com/entry/taking-a-photo-of-your-hotel-room-could-help-save-atraffickingvictimslife_us_57714091e4b0f168323a1ed7 /.

[13] Michele Sarkisian, *Adopting the Code: Human Trafficking and the Hotel Industry*, Cornell University, Oct. 2015, https://ecommons.cornell.edu/items/7cdbb52d-98b6-4fd3-8316-ae21667ed363 /.

[14] *See* Erika R. George and Scarlet R. Smith, *In Good Company: How Corporate Social Responsibility Can Protect Rights and Aid Efforts to End Child Sex Trafficking and Modern Slavery*, 46 N.Y.U. J. Int'l L. & Pol. 55, 66-67 (2013).

41.    Multiple agencies and organizations who actively combat sex trafficking, including the United States Department of Homeland Security, the National Center for Missing and Exploited Children, the Polaris Project, the Texas Attorney General, the Ohio Attorney General, Love 146, the United States Department of Transportation, and EPCAT, among others, have established recommended policies and procedures for recognizing the signs of sex trafficking, particularly in the context of the hotel industry.[15]

42.    This resulted in the development of "red flags" of sex trafficking. Law enforcement agencies and other organizations with subject-matter expertise identified specific indicators of the presence of sex trafficking at a hotel or motel. The signs of sex trafficking in a hotel environment follow well-established patterns and can easily be detected by appropriately trained staff. From check-in to check-out, there are indicators that traffickers and their victims routinely exhibit during their stay at a hotel. These recurring indicators are known as "red flags" of sex trafficking.

43.    Recognized "red flags" of sex trafficking that are considered general indicators of trafficking that can be observed by staff throughout a hotel[16] include:

a.    individuals who appear to be with a significantly older "boyfriend" or in the company of much older males;

b.    a group of girls who appear to be traveling with an older female or male;

c.    a group of girls with similar tattoos, which can indicate "branding" by a trafficker;

---

[15] United States Department of Homeland Security, *Blue Campaign – One Voice. One Mission. End Human Trafficking*, https://www.dhs.gov/sites/default/files/publications/blue-campaign/toolkits/hospitality-toolkit-eng.pdf /; National Center for Missing and Exploited Children, *Risk Factors*, https://www.missingkids.org/theissues/trafficking#riskfactors /; Love 146, *Red Flags for Motel & Motel Employees*, https://love146.org/wp-content/uploads/2017/04/Hospitality-Red-Flag-and-Reporting-Love146.pdf /; Texas Attorney General, *Human Trafficking Red Flags*, https://www2.texasattorneygeneral.gov/files/human_trafficking/human_trafficking_red_flags_handout.pdf /; U.S. Department of Transportation, *Indicators of Human Trafficking*, https://www.transportation.gov/stop-human-trafficking/indicators /; Ohio Attorney General, *Human Trafficking Initiative*, https://www.ohioattorneygeneral.gov/Individuals-and-Families/Victims/Human-Trafficking /.
[16] *Id.*

d. individuals showing fear, anxiety, tension, submissiveness and/or nervousness;

e. individuals who seem disoriented or not present;

f. individuals showing signs of physical abuse;

g. individuals showing signs of restraint or confinement;

h. frequent sounds of physical abuse or violence occurring on the property;

i. individuals showing signs of malnourishment, poor hygiene, fatigue, or sleep deprivation;

j. individuals with signs of untreated illness or injuries;

k. individuals who appear to lack freedom of movement;

l. individuals who appear to be constantly monitored and / or escorted around the motel;

m. individuals who avoid eye contact;

n. individuals who avoid interactions with others;

o. individuals who are not in possession of their own identification;

p. individuals who have few or no personal possessions;

q. a high volume of men who are not registered guests entering and exiting a room;

r. individuals who wait in common areas while other men frequent the room;

s. patrons appeared distressed at check-in;

t. the same person reserving multiple rooms;

u. rooms paid for with cash or prepaid cards;

v. rooms are paid for one day at a time;

w. requests for isolated rooms or rooms close to an exit;

x.   use of hotel computers and / or Wi-Fi for adult oriented or sexually explicit websites;

y.   patrons not forthcoming about identifying information when registering or booking names in the name of their victim;

z.   individuals checking in but then leaving a room only infrequently, not at all, or at odd hours;

aa.  patrons intentionally hiding vehicles and demonstrating concern as to visible license plate numbers;

bb.  individuals appearing to be giving scripted responses;

cc.  frequent use of the "Do Not Disturb" sign or frequent requests made to front desk to not disturb;

dd.  frequent requests for housekeeping services (towels, linens, etc.);

ee.  despite frequent requests, denying staff entry into the room;

ff.  refusal of cleaning services for multiple days;

gg.  excessive amounts of cash in a room;

hh.  presence of multiple computers, cell phones, pagers, or other technology;

ii.  the same person reserving multiple rooms;

jj.  the same person reserving rooms for long periods of time;

kk.  signs of drug use in a room;

ll.  clothes inappropriate for the occasion or weather;

mm.     sex paraphernalia in rooms; and

nn.  unusual stains in the room such as blood and semen,

among other red flags.

44.     The organizations who developed these "red flags," educate and train the hotel industry about them. For example, the United States Department of Homeland Security's Blue Campaign initiative issued specific guidance to the United States hotel industry through a "Hospitality Toolkit" describing human trafficking warning signs that could be detected by various categories of hotel staff.[17]

45.     Before Jane Doe (CH)'s trafficking at the subject Motel 6, each Defendant was educated and trained on these "red flags" of sex trafficking. The organizations that developed these "red flags" identified them as indicators specific to sex trafficking in a hotel or motel environment. At all relevant times, each Defendant acknowledged and recognized these "red flags," specifically as signs of sex trafficking and instructed and trained their staff to treat them as signs of sex trafficking when observed in the motel or hotel.

46.     State, local, federal, and international governments and law enforcement agencies have long recognized the link between commercial sex and sex trafficking. For example:

a.  "The U.S. Government adopted a strong position against legalized prostitution in a December 2002 National Security Presidential Directive based on evidence that prostitution . . . . fuels trafficking in persons, a form of modern-day slavery."[18]

b.  In 2006 the United Nations Commission on Human Rights, Special Rapporteur or Trafficking in Persons recognized that "[f]or the most part, prostitution, as actually practiced in the world, usually does satisfy the elements of trafficking."[19]

---

[17] Department of Homeland Security, *Blue Campaign Toolkit*,
https://www.dhs.gov/sites/default/files/publications/blue-campaign/toolkits/hospitality-toolkit-eng.pdf /;
www.doj.state.wi.us/sites/default/files/ocvs/human%20trafficking/Hospitality%20Toolkit%20-
%20English%20%20Wisconsin%20AG%20Office%20281%29.pdf
[18] United States Department of State, *The Link Between Prostitution and Sex Trafficking*;
https://20012009.state.gov/r/pa/ei/rls/38790 /.
[19] The Council of Europe, *Prostitution – which stance to take?*, July 9, 2007, Paragraph 27,
https://assembly.coe.int/nw/xml/XRef/X2H-Xref-ViewHTML.asp?FileID=11596&lang=EN (citing UN Special
Rapporteur, Sigma Huda).

    c.   By 2008, a report of the Illinois Criminal Justice Information Authority concluded "young women in the sex trade who are controlled by a pimp should not be regarded as girls in prostitution, but as victims of violence who need assistance in safely exiting prostitution."[20]

    d.   In 2010, the Anaheim Police Department (APD) recognized that a significant portion of those involved in prostitution who it came into contact with were likely trafficking victims and adopted a new approach that focused on rescuing women from their pimps and redirecting their lives.[21]

    e.   In 2013, the New York State Court System launched the Human Trafficking Intervention Initiative recognizing that many individuals who end up in criminal courts are on prostitution charges "are recruited into the commercial sex industry by force, fraud, and/or coercion."[22]

47.    When governmental bodies, law enforcement agencies, non-profits, and hospitality-industry organizations developed the "red flags" of sex trafficking in a hotel, they recognized that signs of commercial sex are and should be treated as signs of sex trafficking. Based on the known link between commercial sex and trafficking and the patterns of sex trafficking in hotels, these entities recognized that certain signs associated with commercial sex are important indicators for the detection of sex trafficking in a hotel.

48.    Defendants, as members of the hotel industry, were educated and trained on the link between commercial sex in a hotel or motel and sex trafficking. Accordingly, as of the time of Jane

---

[20] Jody Raphael and Jessica Ashley, *Domestic sex trafficking of Chicago women and girls*, Illinois Criminal Justice Information Authority and DePaul University College of Law (May 2008), https://icjia.illinois.gov/about/publications/domestic-sex-trafficking-of-chicago-women-and-girls/ /.

[21] Steve Marcin, *Prostitution and Human Trafficking: A Paradigm Shift*, FBI Law Enforcement Bulletin, March 5, 2013, https://leb.fbi.gov/articles/featured-articles/prostitution-and-human-trafficking-a-paradigm-shift /.

[22] Center for State Court Innovation, *State Court Snapshot: New York State's Human Trafficking Intervention Courts*, https://cjinvolvedwomen.org/wp-content/uploads/2016/12/HTIC-1pager.pdf /.

Doe (CH)'s trafficking, each Defendant knew and recognized that signs of commercial sex in Portland Motel 6 are and should be treated as signs of sex trafficking.

49.    Each Defendant knew that the link between commercial sex in a motel or hotel environment and sex trafficking was sufficiently strong that ordinary prudence required treating signs of commercial sex activity as signs of sex trafficking. Under the circumstances, ordinary prudence further required each Defendant to avoid benefiting from rental of its rooms for commercial sex because doing so was associated with a strong probability that Defendants were thereby benefiting from the harboring of sex trafficking victims.

50.    The most effective weapon against sexual exploitation and human trafficking is education and training.[23] As ECPAT concluded:

> The hospitality industry is in a unique position to identify and report human trafficking due to its perceived anonymity. Traffickers believe they can go unnoticed while exploiting victims across the globe in hotels— ranging from budget properties to luxury resorts. From check-in to check-out, there are a number of indicators victims and exploiters exhibit during the time they are on a hotel property.[24]

51.    This same conclusion is echoed by others who seek to eliminate sex trafficking in the hospitality industry, including the American Hotel Lodging Association:

> Hotel employees who have undergone training are more aware of trafficking when it happens – and are more willing to report it – than those who have not been trained.[25]

In reference to companies like the Defendants, The Woolf Group concludes:

> Hotels, motels, and resorts can inadvertently become venues for sex trafficking due to their transient nature, offering a discreet and temporary location for illegal activities . . .[26]

---

[23] Polaris Project, *Recognizing Human Trafficking*, https://polarisproject.org/recognizing-human-trafficking/ /.
[24] ECPAT USA, *Training for Hotel Associates*,
https://web.archive.org/web/20200616135423/https://www.ecpatusa.org/hotel-training /.
[25] AHLA, *Free Online Training*, https://web.archive.org/web/20230322121908/https://www.ahla.com/issues/human-trafficking /.
[26] The Woolf Group, *Human Trafficking and the Hotel Industry*, June 7, 2023, https://twgstrategy.com/human-trafficking-and-the-hotel-industry/ /.

52.     Because of the prevalence of human trafficking in hotels or motels and the established body of knowledge about how hotels or motels can detect and respond to signs of sex trafficking, it has long been apparent that the decision of a hotel, hotel chain, motel, or motel chain to continue generating revenue from traffickers without taking necessary steps to identify and deter trafficking is a conscious decision to financially benefit by supporting and facilitating unlawful sex trafficking.

53.     G6 Defendants have made the choice to ignore their knowledge of sex trafficking in their motels or hotels and instead to inadequately train, respond and enforce their own developed and adopted sex trafficking policies. Thus, they have consciously chosen to continue to benefit from sex trafficking of victims like Jane Doe (CH)

### III.    Sex Trafficking at G6 Branded Motels was well Known by G6.

54.     G6's actual knowledge is *not* limited to a general awareness of the problem of sex trafficking in the hotel industry. They have known, since well before Jane Doe (CH)'s trafficking that sex trafficking was ongoing and widespread at G6 properties.

55.     Use of G6 branded properties for sex trafficking is well known to G6 Defendants. Motel 6 motels are one of the five chains most frequently identified as a site of sex trafficking in federal criminal complaints.[27]

56.     From this lawsuit, G6 Defendants knew staff at its branded properties were facilitating sex trafficking and that it was generating revenue through policies that encouraged sex traffickers to operate at G6 brand properties.

---

[27] Sarah Meo and Louise Shelley, *Sex Trafficking and Hotels: Why there is a Need for Effective Corporate Social Responsibility*, Global Police Journal, Nov. *11, 2021,* https://www.globalpolicyjournal.com/blog/11/11/2021/sex-trafficking-and-hotels-why-there-need-effective-corporate-social-responsibility /.

57.    G6 intentionally ensures its motels are "strategically located . . . close to airports, freeways, and other thoroughfares" making them attractive venues for trafficking and compelled prostitution.[28]

58.    Public statements of G6 Defendants confirm that they knew that sex trafficking is a problem in the hotel industry and that they retained control over the response of their branded motels to this problem. G6 Defendants recognize that "[t]raffickers often use motels and motels for sex trafficking activities due to the privacy extended to guests."[29] They also acknowledged the significant role G6 has in the three D's: deterring, detecting, and disrupting sex trafficking in their branded motels.[30]

59.    Information that has become public through news stories establishes the entrenched and pervasive nature of G6's role in providing a venue where sex trafficking has continued unabated for years. G6 monitored news stories and online reviews for indicia of criminal activity at their branded locations, including sex trafficking. Examples of news stories confirm the widespread presence of sex trafficking, prostitution, and related criminal activity at G6 motels:

      a.    In 2017, a Los Angeles Motel 6 became such a hub for human trafficking and other criminal activity that the G6 Defendants paid to settle a public nuisance lawsuit filed by the City of Los Angeles.[31] The settlement required G6 to change its policies and procedures. Upon information and belief, G6 has not changed its policies and procedures.

---

[28] G6, *Motel 6- An Iconic American Brand*, https://g6hospitality.com/our-brands/#about-motel-six /.
[29] G6, *G6 HOSPITALITY ANTI-HUMAN TRAFFICKING TRAINING*, http://g6propertycollateral.com/wp-content/uploads/2020/02/G6_TheRoomNextDoor_Training_V12b_NoFacilitator.pdf /.
[30] *Id.*
[31] CBS News, *Motel 6 pays $250,000 to settle human trafficking suit,* Aug. 31, 2017, https://www.cbsnews.com/news/motel-6-pays-250000-to-settle-human-trafficking-suit/ /.

b. In late 2003, a trafficker set up a sex trafficking venture at a Motel 6 in Connecticut in which two (2) young women were sold for sex eight (8) to ten times per day.[32]

c. In April 2009, a sex trafficking venture operated out of a Motel 6 in Toledo, Ohio.[33]

d. In approximately September 2011, sex traffickers set up an operation at a Motel 6 in Toledo, Ohio to sell fifteen (15) and sixteen (16) year old girls for sex.[34]

e. From approximately 2012 through October 2014, two (2) men engaged in a criminal sex trafficking venture of children which operated in part out of a Motel 6 in Harvey, Illinois.[35]

f. In January 2012, a couple was charged with prostitution and pimping at a Studio 6 in Roswell, GA.[36]

g. Police rescued an eighteen (18) year old girl from a sex trafficker in February 2012, at a Motel 6 in Portland, Oregon.[37]

h. In July 2012, a man was accused of trafficking young girls in foster care for sex. The girls often met customers at a Studio 6 in Jacksonville, Florida.[38]

---

[32] Amy Fine Collins, *Sex Trafficking of Americans: The Girls Next Door*, https://www.vanityfair.com/news/2011/05/human-trafficking-201105 /.

[33] Five Toledoans Indicted On Sex Trafficking Charges, ABC7Chicago.com, Nov. 7, 2010, https://abc7chicago.com/archive/7771888 /.

[34] Mark Reiter, *Two Toledoans Accused Of Juvenile Sex Trafficking*, The Blade, Jun. 1, 2010, https://www.toledoblade.com/Courts/2012/06/02/2-Toledoans-accused-of-juvenile-sex-trafficking-1.html /.

[35] U.S. Dept. of Justice, *Two Aspiring Rappers Charged With Operating Sex-Trafficking Ring In Chicago And Suburbs*, Jan. 15, 2016, https://www.justice.gov/usao-ndil/pr/two-aspiring-rappers-charged-operating-sex-trafficking-ring-chicago-and-suburbs /.

[36] Appen Media, *Couple arrested for pimping, prostitution*, Jan. 17, 2012, https://www.appenmedia.com/public_safety/couple-arrested-for-pimping-prostitution/article_473fe798-1b3d-5c6f-b230-547e3e5c4651.html /.

[37] U.S. Dept. of Justice, *Tacoma Pimp Sentenced To 25 Years For Sex-Trafficking Two Victims*, Nov. 20, 2013, https://www.justice.gov/usao-or/pr/tacoma-pimp-sentenced-25-years-sex-trafficking-two-victims /.

[38] News4Jax, *Feds: Man recruited foster care girls for prostitution*, July 6, 2012, https://www.news4jax.com/news/2012/07/07/feds-man-recruited-foster-care-girls-for-prostitution /.

i.  In August 2012 a person was charged with prostitution at a Studio 6 in Mentor, Ohio.[39]

j.  The FBI investigated and arrested several individuals in December 2012, for the victimization and human trafficking of several young women and a juvenile at a Motel 6 in Madison, Alabama.[40]

k.  The Orange County Human Trafficking Task Force busted a criminal enterprise in December 2012 that was selling women for sex out of a Motel 6 in Anaheim, California.[41]

l.  In approximately March 2013, sex traffickers began operating a sex trafficking venture out of Motel 6 locations in Bangor and Portland, Maine.[42]

m.  Beginning in approximately May 2013, a fifteen (15) year old runaway was trafficked for sex out of the Motel 6 on Caton Avenue in Baltimore, Maryland.[43]

n.  Police investigated a sex trafficker in March 2014 and ultimately charged him for his crimes including, but not limited to, selling a seventeen (17) year old girl for sex out of a Motel 6 in Roseville, Minnesota.[44]

o.  In May 2014, two (2) traffickers were arrested at a Motel 6 in Monterey, California after a twenty-one (21) year old woman escaped from their captivity.[45]

[39] Fox 8, *Mentor Police: Prostitute Ran Massage Parlor at Hotel*, Aug. 3, 2012, https://fox8.com/news/mentor-police-say-prostitute-ran-make-shift-massage-parlor-at-hotel /.

[40] WHNT News 19, *FBI Investigates Human Trafficking At Madison Motel*, Dec. 7, 2012, https://whnt.com/2012/12/07/fbi-investigates-human-trafficking-at-madison-motel /.

[41] ABC 13, *Suspects Busted in Anaheim Sex Ring*, Dec. 5, 2012, https://abc13.com/archive/8909784 /.

[42] Danielle McLean, *What Drives Maine Sex Traffickers' Inhumanity*, Bangor Daily News Maine Focus, Sept. 12, 2016, https://bangordailynews.com/2016/09/12/mainefocus/what-drives-maine-sex-traffickers-inhumanity /.

[43] Anne Kramer, *Man Faces Prison Time For Sex Trafficking Baltimore Teen*, WBAL News Radio, Apr. 10, 2014, https://www.wbal.com/article/106578/2/man-faces-prison-time-for-sex-trafficking-baltimore-teen /.

[44] Pioneer Press, *Man, 25, Is Accused Of Trafficking Teens*, Jun. 5, 2014, https://www.twincities.com/2014/06/05/man-25-is-accused-of-trafficking-teens-2 /.

[45] Felix Cortez and Amy Larson, Monterey Police: 2 Human Sex Traffickers Arrested After Victim Escapes Motel, KSBW8, May 9, 2014, https://ksbw.com/article/monterey-police-2-human-sex-traffickers-arrested-after-victim-escapes-motel/1054172 /.

p.  In the summer of 2014, two (2) girls ages fifteen (15) and sixteen (16) were taken from a children's shelter by a sex trafficker and trafficked out of a Motel 6 in Cutler Bay, Florida.[46]

q.  A Las Vegas man was charged with sex trafficking two (2) victims, including a seventeen (17) year old girl, in January 2015, out of a Motel 6 in Rapid City, Nevada.[47]

r.  In February 2015, two (2) men were arrested for sex trafficking a fourteen (14) year old girl at a Motel 6 in Seekonk, Rhode Island.[48]

s.  A local law enforcement investigation resulted in the rescue of a fifteen (15) year old runaway in February 2015, from a Motel 6 near the Oakland, California airport where she was being sex trafficked.[49]

t.  In North Charleston, South Carolina, a seventeen (17) year old girl was rescued in March 2015 from a Motel 6 by special agents from the United States Department of Homeland Security. The girl was sold for sex, beaten, and starved by a sex trafficker.[50]

---

[46] David Goodhue, *Next Stop For Man Accused Of Sex Trafficking 2 Teens: Federal Court,* Miami Herald, Sept. 2, 2015, https://www.miamiherald.com/news/local/news-columns-blogs/deadline-miami/article33360843.html /.
[47] Argus Leader, *Las Vegas Man Charged With Human Trafficking In Rapid City,* Jan. 17, 2015, https://www.argusleader.com/story/news/crime/2015/01/17/las-vegas-man-charged-human-trafficking-rapid-22-city/21922915 /.
[48] Stephen Peterson, *RI Man Gets Jail In Sex-Trafficking Case Involving Seekonk Motel,* The Sun Chronicle, Oct. 28, 2016, http://www.thesunchronicle.com/news/local_news/ri-man-gets-jail-in-sex-trafficking-caseinvolvingseekonk/article_d7a25494-9d21-11e6-8f94-63e5c74facb3.html /.
[49] Emilie Raguso, *Woman Charged In Berkeley Teen Sex Trafficking Case,* Berkley Side, Dec. 8, 2015, https://www.berkeleyside.com/2015/12/08/woman-charged-in-berkeley-teen-sex-trafficking-case /.
[50] Melissa Boughton, *Police Say Teen Starved, Beaten at North Charleston Motel; Man Arrested in Sex-Trafficking Case,* Post and Courier, Mar. 2, 2015, https://www.postandcourier.com/archives/police-say-teen-starved-beaten-at-north-charleston-motel-man-arrested-in-sex-trafficking-case/article_032153ee-fcb6-5333-9182-926a7f43dfbf.html /.

u.  Two men were arrested in March 2015 for sex trafficking a fifteen (15) year old girl at Motel 6 in Austin, Texas.[51]

v.  In March 2015, police arrested a man for sex trafficking a runaway seventeen (17) year old at a Motel 6 in Warwick, Rhode Island.[52]

w.  Over a fourteen (14) month period ending in approximately April 2015, at the same Motel 6 in Warwick, Rhode Island had seventy-five (75) arrests on its property for crimes including sex-trafficking.[53]

x.  Seven (7) people were indicted in January 2016, by a Colorado grand jury for sex trafficking children from 2014 through the summer of 2015, out of hotel / motel locations in Denver, Colorado, including a Denver area Motel 6.[54]

y.  In the summer of 2015, a woman was arrested at a Motel 6 in Great Falls, Montana where she was involved in sex trafficking a seventeen (17) year old girl.[55]

z.  A married couple was indicted in June 2015, for their roles in sex trafficking minor children ages seventeen (17), sixteen (16), and fifteen (15) years old out of a Motel 6 in Everett, Washington.[56]

---

[51] Lindsay Bramson, *Local Teen Saved from Sex Slavery; Two Charged*, KXAN Austin (Mar. 6, 2015), https://www.kxan.com/news/local/austin/local-teen-freed-from-sex-slavery-two-charged/1049580764 /.
[52] Amanda Milkovits, *Massachusetts Man Accused Of Trafficking Teen In Warwick Motel*, Providence Journal (Mar. 24, 2015), https://www.providencejournal.com/story/news/crime/2015/03/24/massachusetts-man-accused-trafficking-teen/34931862007/ /.
[53] Sarah Kaplan, *Crime-Ridden Motel 6 In R.I. Will Hand Over Guest List To Police*, The Washington Post (Apr. 28, 2015), https://www.washingtonpost.com/news/morning-mix/wp/2015/04/28/crime-ridden-motel-6-in-r-i-will-hand-over-guest-list-to-police/ /.
[54] Hsing Tseng, *Seven Indicted By Colorado Grand Jury In Child Sex Trafficking Ring Bust*, Fox 31 Denver, Jan. 6, 2016, https://kdvr.com/2016/01/06/7-indicted-by-colorado-grand-jury-in-child-sex-trafficking-ring-bust /.
[55] Andrea Fisher, *Woman Caught Up In Human Trafficking Ring Pleads Guilty*, Aug. 29, 2016, https://www.greatfallstribune.com/story/news/local/2016/08/29/woman-caught-human-trafficking-ring-pleadsguilty/89566374/ /.
[56] Diana Hefley, *County Investigating 45 Ongoing Human Sex Trafficking Cases*, HeraldNet, Jun. 26, 2015, https://www.heraldnet.com/news/county-investigating-45-ongoing-human-sex-trafficking-cases/ /.

aa. In Tuscaloosa, Alabama police rescued a fourteen (14) year old girl from a Motel 6 in June 2015, and a grand jury subsequently charged her assailant with human trafficking and rape.[57]

60.    These articles are only limited representative examples. There are many similar articles about sex trafficking and other associated criminal activity at G6 branded motels. Moreover, on information and belief, G6 Defendants are aware of additional significant law enforcement activity related to trafficking at its motels that was not reported in the media. Ultimately, several hundred of traffickers involved with hundreds of victims have been prosecuted by state and federal law enforcement agencies for sex trafficking and forced prostitution out of G6 branded properties.

61.    Reviews of G6 branded properties, which upon information and belief, each of G6, monitored regularly, also show both the pervasiveness of sex trafficking at G6 properties and G6's knowledge of the same. For example:

a. 2010 TripAdvisor review out of Maine states "[M]y tour group and I figured that we should just stay here considering we were only staying here one night...There was dirtbags hanging around the pool area, and in the little yard area on the side. It looked as if all of the people who LIVED THERE were on drugs by the way they talked! Also during my stay there we saw a prostitute who must have been living there! She looked anorexic and came into the lobby telling the receptions that the cops might be coming so tell her if they show up! (i am not making any of this up) there was also "a security guard" there waiting in the lobby all day and throughout

---

[57] Stephanie Taylor, *Tuscaloosa man charged with rape and human trafficking of Mississippi teen,* Tuscaloosa News, Nov, 6, 2014, https://www.tuscaloosanews.com/story/news/2014/11/06/tuscaloosa-man-charged-with-rape-and-human-trafficking-of-mississippi-teen/29940888007/ /.

the night making sure that the prostitute did not leave. They told the receptionist that the prostitute had 2 clients upstairs..."[58]

b. 2011 Yelp review in California states "...We paid to spend two night, but after one night of being terrorized by pimps, prostitutes, "druggies" and homeless sleeping in cars we checked out...Our lasting memory should be the beautiful wedding, but instead it will be know as our night of terror. The management is well aware of this and contribute to the problem by renting rooms to these terrorist..."[59]

c. 2011 TripAdvisor review from California states "...After watching the pedestrian and vehicle traffic for a period of time in the immediate area, it is apparent that the staff does not decline service to prostitutes w/ their protection (pimps) and drug dealers...While the affordable rates are the draw, once your there, you'll realize that Corporate hasn't paid attention to what occurs there or doesn't care as long as the money keeps coming in."[60]

d. 2011 Yelp review from California states "Sheets and towels are frequently stained. Prostitution is a problem at this location, leading me to believe management and the staff (who are very friendly with the hookers) turns a blind eye to it to fill rooms or is being paid to look the other way..." [61]

e. 2012 TripAdvisor review from Colorado states "...The first night, I received phone call after phone call, asking if I wanted "sexual favors" done to me. NO!!!!!! I also witnessed numerous drug dealings going on, and had my door banged on several

---

[58] https://www.tripadvisor.com/Hotel_Review-g41519-d244102-Reviews-Motel_6_Boston_North_DanversDanvers_Massachusetts.html
[59] https://www.yelp.com/biz/motel-6-santa-rosa-south-santa-rosa
[60] https://www.tripadvisor.com/Hotel_Review-g32810-d78752-Reviews-Motel_6_Oakland_AirportOakland_California.html
[61] https://www.yelp.com/biz/motel-6-salinas

times…Upon checkout, I explained issues to the clerk (the same person who checked me in) and she said, oh well…" [62]

f.   2012 Yelp review out of Texas states "Do not stay here. Just stayed here and had some shadey stuff goin on…for one the motel is a front for a prostitution ring the owners are running…I turned down one of the girls who in which called my room phone and asked if I wanted company and soon after had one with purple hair and what looked like her pimp at my door. I didn't answer I just watched through the peep hole. after they knocked for about 5 mins they left. As soon as I got comfortable I hear someone messing with my door and I look through the peep hole and they are back and are trying to use a key.. woooow…" [63]

g.   2012 Yelp review from California states "what to say about the "no tell motel sex" lol sad but true...my neighboor had people as in men in and out all night long if you get my drift, and when i called the front desk they said they would check it out and never did…" [64]

h.   2012 TripAdvisor review out of Illinois states "I have recently been relocated with my job out here so looking for a place in glenview area. I stood here for a week. They had pimps and prostitution going on next door, under and across from me my whole week hear. I told front desk of the noise and loud banging they were making all day and night long. The front desk called one room where they were in the prostitute got rude with her you can hear it they were told to check out but the same day they checked back in next door to me. Staff here must be in on it some how

---

[62] https://www.tripadvisor.com/Hotel_Review-g33388-d83061-Reviews-Motel_6_Denver_Central_Federal_Boulevard-Denver_Colorado.html
[63] https://www.yelp.com/biz/motel-6-dallas-4
[64] https://www.yelp.com/biz/motel-6-escondido?start=60

cause I watched a pimp and a few under age girls go in and out a few rooms across and next to me all night long with custermers. The following morning around 5am I was woken to a girl in the hall yelling at the pimp who just hit her. It gets better I guess staff told them I made a complaint so then after they were banging on my door and getting rooms next to me as well making extreme noise so they can get me out..." [65]

i. 2013 TripAdvisor review from New York states "If you like drugs and drug addicts and drug dealing and prostitutes, this is the place to go. Not only do these people live in the hotel and use it as a place of business, but some of the staff is involved in drug dealing as well..." [66]

j. 2013 TripAdvisor review from Tennessee states "Two different rooms within sight of my room had prostitutes working out of them, one with an amazingly loud and foul-mouthed guy. I was tailed by a drug dealer who seemed to be concerned that I was competition and once he determined that I wasn't, he disappeared. There are obviously semi-permanent residents there. . . . To the management who will undoubtedly respond to this review with some sort of vague platitudes about being happy to hear comments from their guests: Save your typing fingers. It's pretty clear that you INTEND to operate your property like this. Your property is unsafe, unsanitary, and you are doing NOTHING to prevent it." [67]

---

[65] https://www.tripadvisor.com/Hotel_Review-g36052-d243950-Reviews-
Motel_6_Chicago_North_GlenviewGlenview_Illinois.html
[66] https://www.tripadvisor.co.nz/Hotel_Review-g29810-d93070-r172297063-
Motel_6_Amherst_NY_BuffaloAmherst_New_York.html
[67] https://www.tripadvisor.com/Hotel_Review-g55229-d98206-Reviews-Motel_6_Nashville-
Nashville_Davidson_County_Tennessee.html

k.  2013 Yelp review from California states: "If you want drugs, hookers, tweekers, dope heads, and shitty service this is your place. I wish the police would shut this place down. This is a great neighborhood but this place draws the worst people I have ever seen. I don't get how the police havent shut this place down. Police should be warned and concerned about this horrible establishment!!! do not bother with this horrid location."[68]

l.  2013 TripAdvisor review from Illinois states: "I have recently been relocated with my job out here so looking for a place in glenview area.I stood here for a week. They had pimps and prostitution going on next door, under and across from me my whole week hear. I told front desk of the noise and loud banging they were making all day and night long. The front desk called one room where they were in the prostitute got rude with her you can hear it they were told to check out but the same day they checked back in next door to me.Staff here must be in on it some how cause I watched a pimp and a few under age girls go in and out a few rooms across and next to me all night long with custermers. The following morning around 5am I was woken to a girl in the hall yelling at the pimp who just hit her. It gets better I guess staff told them I made a complaint so then after they were banging on my door and getting rooms next to me as well making extreme noise so they can get me out. Also they were also throwing rocks late night at my windows. This place is more like a homeless shelter but you pay for it!!! They have cams in the hallways

---

[68] https://www.yelp.com/biz/motel-6-sacramento-sacramento

but obviously they dont watch them or they dont work or care!!!! Stay away if you are smart!!!!"[69]

m. 2014 Expedia review from Texas states: "We only stayed one of two nights since I refused to stay another night with my daughter in what seemed like a brothel. For starters, there are some very sleazy low lifes that stand by the side doors making it very intimidating to enter. They would let in scantily clad women wearing wigs and other sleazy looking people who I assumed were the "johns". I also saw what looked like drug deals taking place. When I would use the side door, there was always some guy that would try to get in although it was obvious they weren't staying there."[70]

n. 2014 TripAdvisor review from Louisiana states: "had $500 stolen from my room, elevator stunk of marijuana and my friend was offered a prostitute by what must have been an organised ring at the motel that the staff were happily working with! No refund offered when I was there even when I E-mailed the Motel 6 when I got home they obviously didnt care as they never got back to me, just awful"[71]

o. 2014 review from Georgia states: "I don't know why Motel 6 management has allowed this one to be taken over by creeps, but it has. This place will not give you a good night sleep with the all night drug deals and hookers yelling, slamming doors, and dogs barking (yes, dogs barking!). ...Seriously, it ain't safe and it needs to be shut down by the city. DON'T GO HERE!!!!!"[72]

---

[69] https://www.tripadvisor.com/Hotel_Review-g36052-d243950-Reviews-Motel_6_Chicago_North_GlenviewGlenview_Illinois.html
[70] https://www.expedia.com/Dallas-Hotels-Motel-6-Dallas.h73785.Hotel-Reviews
[71] https://www.tripadvisor.com/Hotel_Review-g60864-d1203913-Reviews-Siegel_Select_New_Orleans-New_Orleans_Louisiana.html
[72] https://www.tripadvisor.com/Hotel_Review-g35322-d86893-Reviews-Motel_6_Atlanta_Tucker_Northeast-Tucker_Georgia.html

p.  A reddit thread titled "Motel 6 Shenanigans", in regards to a Motel 6 location in Norfolk, VA says as follows: "I had a friend that needed a quick cheap dog friendly place for a few nights, she picked Motel 6 on Military. There's prostitution with pimps waiting in the parking lot, drug dealing and vices that haven't been invented yet. What blew her mind was the dump truck washing that goes on overnight. She said from sundown to sunrise dump trucks line up, get power washed by a small army of Indian men. The power washers making sleep impossible. We had a debate if there were worse motels in Norfolk, and I said no, she thinks there are. Just in case you were thinking about staying there." Comments in this thread state as follows: "This is like complaining that Waffle House wasn't a five star experience."; "I know people are like "you get what you pay for" but there's no way in hell that you should have to deal with blatant illegal activities lmao"; "There's a reason people I knew from around there called it the Motel Sex, and not for the Honeymoon Suites."; "At the end of the day there's a famous saying "you get what you pay for".", "The motel that used to be at the corner of Tidewater and Virginia Beach Blvd always had some shenanigans going on. It was a hotspot for the FBI and DEA."; "Oh those motels out there been having prostitution for a while."; "It's incredibly well known for being horrific. Beware and stay safe, y'all."; "Motel 6 in Janaf area… hmmm what else did you expect? Are you not from Hampton roads to know that? Shit, it would take me 1 drive through that area as a tourist to know the motel 6 right there would be awful…."[73]

---

[73] https://www.reddit.com/r/norfolk/comments/1jywifw/motel_6_shenanigans/

62.    These reviews are limited representative examples. There are many similar online reviews for G6 branded motels on information and belief.

63.    News stories, online reviews, guest complaints, public statements, and law enforcement efforts establish that, at the time Jane Doe (CH) was trafficked at Portland Motel 6, G6 knew or should have known:

    a.    The use of G6 branded properties for sex trafficking was not limited to one location or geographic region but was a widespread problem;

    b.    Commercial sex work occurring at G6 branded properties involved trafficking and compelled prostitution;

    c.    G6, Franchise, and staff were not taking reasonable steps to deter, detect, and disrupt known or probable sex trafficking occurring at G6 motel properties;

    d.    Their efforts, if any, to stop facilitating sex trafficking in G6 branded properties were not effective; and

    e.    They were, by their acts and omissions, facilitating sex trafficking at G6 branded properties by providing venues where that trafficking was occurring widely and without sufficient detection or deterrence.

64. Despite the continually mounting evidence that sex trafficking at G6 branded properties was ongoing and growing, G6 did not change course. G6 chose to continue earning revenue and profits from renting out space in their motels as a venue for trafficking.

## IV.    G6 and Franchisee had actual and constructive knowledge of widespread and ongoing sex trafficking at Portland Motel 6

65.    At all relevant times, G6 and Franchisee also knew or should have known that sex trafficking was prevalent at Portland Motel 6 specifically because there was widespread sex trafficking on site that followed well-established patterns and presented with obvious signs that

G6 and Franchisee knew and acknowledged to be indicators of sex trafficking in a motel environment.

66.    Franchisee and / or G6 knew that Portland Motel 6 was in a high-crime area with a high incidence of criminal activity. Law enforcement records indicate obvious and apparent criminal activity on the property.

67.    Just a small sample of online reviews, articles, and complaints confirm the presence of criminal activity associated with sex trafficking at Portland Motel 6, for example:

a.    A Yelp.com review from December 30, 2007 says as follows: "***STAY HERE AT YOUR OWN RISK!!!*** We were about to stay here tonight. Pulled into the parking lot and a cop followed us in. Apparently, we didn't signal for at least 100 feet before turning into the parking lot, but I think the cop saw our California plates and wanted to know what we were doing there. After we answered his questions and explained that we were headed back to California from our road trip, he let us go. As he was driving away, I waved him down and asked him about the neighborhood we were in. He said that the area was DRUG INFESTED and advised us to find a motel further down the 5. It was a blessing that the cop followed us in. Please be careful when traveling."[74]

b.    A Yelp.com review from October 31, 2022 says as follows: "Downhill. This place has entirely new management and staff compared to 1 year ago and it shows. All employees are temp workers and have zero initiative or customer service. The management acts as if she has no control over anything but has no problem taking your money anyways. Constantly broken vending machines, constantly dirty

---

[74] https://www.yelp.com/biz/motel-6-north-portland-portland?q=drug

hallways, constantly FILTHY elevator that absolutely seems to be on its last legs. The parking lot is often occupied by people who aren't staying at the motel and security does not remove them or even question them. Broken glass and an abundance of dog waste everywhere, sometimes even INSIDE the building. They are cheap but I have paid less and received much better elsewhere. If you need a place to spend the night, this place will definitely work for you, but if you want to stay a week, you're be HAPPY to leave at the end of that week. Also my largest complaint; night staff doesn't care about safety. There have been fires started inside as well as nude drug addicts roaming the halls and people sleeping in the stairwells. No one is watching the cameras, no one is walking around. Not safe, not a good vibe."[75]

c.  A July 14, 2022 hotel review from Expedia.com says "The room reeked of cigarettes. Prostitutes in the parking lot and homeless camping out by the dozens half a block away. Did not feel safe at all." [76]

68.    Based on hotel reviews, news articles, and / or complaints, the hotel staff at Portland Motel 6, on information and belief, reacted with indifference to guest reports about the signs of criminal activity, thereby facilitating criminal activity at the motel.

69.    Jane Doe (CH)'s trafficker and other traffickers repeatedly chose to use Portland Motel 6 for their sex trafficking activity because of policies and practices that created a favorable environment for trafficking.

---

[75] *Id.*
[76] https://www.expedia.com/Portland-Hotels-Motel-6-Portland.h1040730.Hotel-Information?pwaDialog=product-reviews

70.    Motel staff turned a blind eye to signs of trafficking. The trafficker operated with minimal expenditure of time and resources on concealment due to an implicit understanding with Portland Motel 6 that they could operate without risk of disruption.

71.    Based on news stories, motel reviews, guest complaints and records of law-enforcement calls, there were multiple victims trafficked at Portland Motel 6 before and during Jane Doe (CH)'s trafficking. These traffickers followed a repetitive and routine procedure during stays at Portland Motel 6 and there were "red flags", as listed above, of trafficking observed by motel staff and management.

72.    All knowledge from the staff at Portland Motel 6 is imputed to Franchisee and G6 Defendants who knew or should have known about the trafficking at Portland Motel 6 based on the direct observation of motel staff, including management-level staff. This knowledge is imputed to G6 based on the existence of an agency relationship as described below.

73.    Franchisee also knew or should have known about the sex trafficking at Portland Motel 6 based on:

     a.    surveillance of the property;

     b.    internal investigations;

     c.    customer complaints;

     d.    monitoring of customer feedback;

     e.    information received from law enforcement;

     f.    and other sources of non-public information available to The Franchisee.

74.    G6 required Franchisee and motel staff to report suspected criminal activity at Portland Motel 6, including sex trafficking, to G6.

75.     Based on the obvious signs of sex trafficking at the motels, Franchisee were required to, and upon information and belief did, report numerous instances of the suspected sex trafficking to G6.

76.     G6 also knew or should have known the trafficking at the subject Motel 6 based on:

a.  The obligation of motel staff and Franchisee to report suspected criminal activity, including sex trafficking, to G6;

b.  G6's regular monitoring of online reviews;

c.  G6's collection and monitoring of customer surveys and complaints;

d.  G6's requirement that Franchisee submit regular and detailed reports to G6 about day-to-day motel operations;

e.  G6's collection and monitoring of Wi-Fi data about guests at Portland Motel 6, including but not limited to room reservations, identification and payment information, data from websites visited on Wi-Fi, and other guest data;

f.  G6's supervision and control over day-to-day operations of Portland Motel 6 through detailed information and extensive reports that it obtained through the property management system and other software systems it required Franchisee to use and through which Franchisee were obligated to allow G6 to obtain real-time data to allow it to monitor motel operations on a day-to-day basis;

g.  G6's regular inspections of Portland Motel 6;

h.  G6's employment of "field agents" to work with motels on quality assurance, encompassing security issues, including trafficking issues;

i.  G6's access to surveillance and security systems;

j.  Information provided to G6 by law enforcement; and

    k.  Other sources of information available to G6.

77.    G6 and Franchisee observed obvious "red flags" of numerous instances of sex trafficking occurring at Portland Motel 6 based on their supervision and monitoring of the property. As a result, G6 knew or should have known that Portland Motel 6 was facilitating widespread sex trafficking.

**V.    Defendants knew Jane Doe (CH) was being trafficked at Portland Motel 6 because of the apparent and obvious "red flags" of sex trafficking.**

78.    During the period that Jane Doe (CH) was trafficked at Portland Motel 6, there were obvious "red flags" that her trafficker was engaged in sex trafficking at both locations:

    a.  Paying for stays in cash

    b.  Paying for extended stays on a day-by-day basis

    c.  Frequent requests for linen changes

    d.  Obvious signs of illegal drug use

    e.  Large numbers of male visitors asking for Plaintiff or her trafficker at the front desk.

    f.  Lots of male "johns" coming in and out of the room

    g.  Loud noises of abuse audible to staff

79.    Employees at Portland Motel 6, including management-level employees, observed or were made aware of these obvious signs of Jane Doe (CH)'s trafficking while acting within the scope and course of their employment, including:

    a.  The "red flags" listed in paragraph 79 of this Complaint

    b.  Motel staff knowing the trafficker by name and being friendly with the trafficker

    c.  Motel staff accepting money to look the other way or warn the trafficker about police.

    d.  Plaintiff walking through the front of the lobby with the trafficker.

    e.  Motel staff repeatedly informing Plaintiff and her trafficker that they received noise complaints and would be kicked out if they were not quiet.

    f.  On one occasion, the trafficker paid the front desk staff due to the noise complaints. The front desk employee was an older white woman with brunette hair and glasses; she worked morning shifts for the most part.

    g.  Plaintiff and her trafficker also repeatedly encountered the same Hispanic cleaning woman.

80.    As such, G6 Defendants and Franchisee knew or were willfully blind to the fact that Jane Doe (CH) was being trafficked at Portland Motel 6.

81.    Given these obvious signs, among other "red flags", and G6's intimate management, control, ownership, or operation of the subject properties, G6 knew or should have known about the trafficking activity that resulted in the trafficking of Jane Doe (CH) pursuant to their policy or protocol under which Franchisee and motel staff were required to, and upon information and belief did, report suspected sex trafficking to G6.

82.    G6 also knew or should have known about the trafficking of Jane Doe (CH) based on the numerous tools, described above, through which they monitored and supervised Portland Motel 6.

83.    G6 also had constructive knowledge of the activity that resulted in the trafficking of Jane Doe (CH) at Portland Motel 6 because that activity was accompanied by such recognized "red flags" of sex trafficking that it was readily detectable through the exercise of ordinary diligence. If G6 had exercised ordinary prudence in areas of operations over which they retained control or in which they directly participated, they would have detected and stopped benefiting from the illegal activities of Jane Doe (CH)'s trafficker at Portland Motel 6:

a. G6 retained control over, assumed responsibility for, and were directly involved in training and education of motel staff regarding the detection of sex trafficking. If they had exercised ordinary prudence in creating, providing, and enforcing this training, then the activities of Jane Doe (CH)'s trafficker would have been detected.

b. G6 retained control over, assumed responsibility for, and affirmatively participated in the development, implementation, and enforcement of policies, procedures, and practices regarding the detection of and response to suspected sex trafficking at Portland Motel 6. If they had exercised ordinary prudence in adopting, implementing, and enforcing policies and protocols, then the activities of Jane Doe (CH)s trafficker would have been detected.

c. G6 played a primary role in the rental of rooms at Portland Motel 6. If they had exercised ordinary prudence as to the development, implementation, and enforcement of policies, procedures, and practices regarding standardized check-in protocol, payment methods, identification requirements, obtaining vehicle information, and monitoring visitors who are not registered motel guests, then the activities of Jane Doe (CH)'s trafficker would have been detected.

d. G6 retained control over and directly participated in the collection, tracking and analysis of guest data, property data, Wi-Fi data, and security data and retained sole ownership of all guest data. This data revealed "red flags" of sex trafficking. If G6 had exercised ordinary prudence as to the monitoring and analysis of this data, the activities of Jane Doe (CH)'s trafficker would have been detected.

## VI.    Franchisee facilitated the trafficking activity at Portland Motel 6, including the trafficking of Jane Doe (CH)

84. Franchisee harbored and facilitated the providing, maintenance, and exploitation of Jane Doe (CH) at Portland Motel 6 when it continued to provide rooms where they were imprisoned and exploited despite actual knowledge of or willful blindness to the fact that these victims were being trafficked at Portland Motel 6.

85. Despite having actual or constructive knowledge of widespread and ongoing sex trafficking at Portland Motel 6, Franchisee continued renting rooms used in sex trafficking, providing traffickers with a safe heaven, and operating Portland Motel 6 in a way that enabled and facilitated sex trafficking activity.

86. Although Franchisee knew or should have known about the activity that resulted in Jane Doe (CH) being trafficked, Franchisee continued to rent motel rooms for and to facilitate that trafficking activity.

87. Franchisee also facilitated widespread trafficking at Motel 6, and G6 also facilitated widespread trafficking Motel 6, including the trafficking of Jane Doe (CH), in ways including, on information and belief:

 a. developing relationships with multiple traffickers, including Jane Doe (CH)'s trafficker, and creating an understanding that these traffickers could operate at the motel without risk of interference;

 b. continuing to provide rooms, services, and assistance to traffickers in the face of obvious "red flags" and indicia of human trafficking, as described above;

 c. accommodating specific requests made by traffickers;

 d. serving as lookouts for traffickers;

 e. leaving doors unlocked or ajar for the benefit of the traffickers;

 f. accepting bribes from the traffickers;

g.  observing Jane Doe (CH) in obvious distress but continuing to provide support to her trafficker;

h.  allowing "johns" who were not registered motel guests to freely access the motel without requiring identification or any other method of tracking;

i.  using inappropriate and inadequate practices for hiring, training, supervising, managing, and disciplining front-line staff regarding issues related to human trafficking;

j.  following a pattern or practice of failing to contact law enforcement despite obvious indicia of criminal activity, including sex trafficking, occurring on site;

k.  implicitly encouraging the activities of traffickers by creating an environment where they did not need to incur the burden of taking significant steps to conceal their activities but, instead, could operate without concern for detection or interference by the motel staff; n. providing these traffickers with the cover of a legitimate business where they could operate without having to divert significant time and resources to avoid detection or interference by motel staff.

88.     Franchisee's acts and omissions, which were motivated by a single-minded focus on profit-maximization (including profits from room rentals and marketing optimization through collection of Wi-Fi data), showed serious indifference to and callous disregard for the rights of sex trafficking victims, including Jane Doe (CH).

89.     Franchisee knew that sex trafficking causes immeasurable harm to victims and, nonetheless, knowingly or recklessly engaged in a longstanding pattern of conduct that generated revenue (including room rental profits and marketing optimization through Wi-Fi data collection) through facilitating that trafficking.

**VII.    G6 facilitated the trafficking activity at the subject Motel 6, including the trafficking of Jane Doe (CH)**

90.    G6 participated directly in aspects of the operation of Portland Motel 6 that influenced whether and to what extent trafficking occurred at Portland Motel 6, including but not limited to the trafficking of Jane Doe (CH), as follows:

   a.    G6 Defendants have publicly assumed responsibility and control over the human trafficking response of all Motel 6 and Studio 6 properties, including design and implementation of practices to prevent trafficking, safety and security procedures, employee and franchisee education, training, and response, partnership with external organizations, and advocacy.

   b.    G6 Defendants retained control over when its branded motels would share information with law enforcement and when law enforcement would be contacted about suspected criminal activity in G6 branded motels.

   c.    G6 Defendants retained control over the response to trafficking by creating a reporting hotline for motel staff and franchisees to report suspected human trafficking to the G6 Defendants. G6 Defendants determined when issues should be escalated to the National Human Trafficking Hotline or law enforcement.

   d.    G6 Defendants retained control over determining which motels needed additional training or other resources based on a high risk of human trafficking and other related criminal activity.

   e.    G6 Defendants expressly retained control to terminate motel staff and/or a franchising agreement based on the response to human trafficking.

   f.    G6 Defendants maintained quality assurance over Portland Motel 6, terminating franchise agreements for failing to meet their required "brand standards."

g. G6 Defendants retained control, at the brand-wide level, over training on how to spot the signs of and help prevent human trafficking. G6 Defendants determined whether the training is provided, when it is provided, the content of the training, how the training is delivered, who receives the training, and the consequences if someone does not participate in the training or fails to follow such training.

h. Although they delayed making any reasonable effort to do so, G6 Defendants acknowledge that they retain control to adopt requirements for franchised motels specifically designed to prevent human trafficking and other criminal activity.

i. G6 Defendants maintain a Safety & Security Team and a Critical Incident Rapid Response Team that are charged with investigating and responding to potential criminal incidents at all of their branded properties, including suspected trafficking incidents.

j. G6 Defendants are responsible for adopting, enforcing, and monitoring policies and codes of conduct related to human trafficking at each Motel 6.

k. G6 Defendants maintained control over all details of the terms under which franchised motels or hotels, including Portland Motel 6, offered internet services to customers, including dictating the software, hardware, and service provider to be used, setting all policies about use and restrictions on use, and actively collecting and monitoring guest internet usage data. G6 Defendants dictated whether sites frequently used to solicit clients for sex trafficking victims would be accessible through the internet at Portland Motel 6. G6 used this collected data to optimize their marketing and consequential profit maximization.

l.   G6 Defendants retained control over the setting, supervision, overseeing, and enforcement of detailed policies and protocol for housekeeping services at Portland Motel 6, including policies for how often rooms must be entered, how to respond to guest refusals of entry into rooms, and steps to monitor guest safety issues through housekeeping services.

m.   G6 Defendants collected, maintained, and analyzed detailed data regarding housekeeping services at Portland Motel 6, including trends that would reveal patterns consistent with human trafficking.

91.   G6 played a central role in renting rooms at Portland Motel 6 by, among other things:

a.   G6 Defendants controlled all details of the guest reservation, check-in, and payment processes through management and control over all systems used for those processes and adoption of detailed and specific policies governing the means and methods used for each of these processes.

b.   G6 Defendants directly made reservations for rooms at Portland Motel 6 and accepted payment for those rooms through a central reservation system that they controlled and operated. G6 Defendants could reserve rooms and accept payments without requiring franchisees' approval or involvement.

c.   G6 Defendants established and maintained control over a brand-wide "do not rent" system. G6 Defendants set all policies related to use of this system and dictated the day-to-day details of reservations at Portland Motel 6 through detailed policies that it established regarding use of this "do not rent" system.

d.  G6 Defendants controlled room rates, required discounts, mandatory fees, and rewards programs.

e.  G6 Defendants controlled and restricted the ability of franchisees and staff to refuse or cancel a reservation.

f.  G6 Defendants controlled and oversaw policies and procedures regarding check-in, payment and identity verification procedures.

g.  G6 Defendants collected, retained, monitored, and analyzed detailed data about every guest who stayed at the motels.

h.  G6 Defendants established detailed policies and protocol that dictated, step-by-step, everything that would happen from the time a guest arrived at Portland Motel 6, until they entered their guest room. This included operational directives regarding payment methods, identification requirements, the number of guests that could be in each room and whether information needed to be collected for each guest, what questions motel staff should and should not ask, and other matters related to check-in.

i.  G6 Defendants required franchisees to use G6's property management system, which was owned, maintained, controlled, and operated by the G6 Defendants, for virtually all aspects of motel operations regarding room reservations and payment.

j.  G6 Defendants oversaw do not rent (DNR) lists for their branded properties.

92.    Despite having actual or constructive knowledge of widespread and ongoing sex trafficking at Portland Motel 6, G6 continued renting rooms to traffickers pursuant to their venture, including the rooms used to sexually exploit Jane Doe (CH).

93.    Policies purportedly enacted and enforced by G6 to identify signs of sex trafficking and stop it from occurring were not properly implemented and/or enforced at Portland Motel 6.

94.    Upon information and belief, despite having actual or constructive knowledge of the ongoing sex trafficking at Portland Motel 6, including the activity that led to Jane Doe (CH)'s trafficking, G6 used their retained control over and direct involvement in motel operations to facilitate trafficking, including by:

     a.  G6 Defendants adopted inappropriate and inadequate practices for selecting, training, supervising, managing, and disciplining franchisees and motel staff regarding issues related to human trafficking.

     b.  G6 Defendants provided inadequate training on issues related to human trafficking and unreasonably delayed providing training.

     c.  G6 Defendants adopted a safety and security budget and safety and security practices that were clearly insufficient considering the known problem of sex trafficking at Motel 6 properties.

     d.  G6 Defendants implicitly approved decisions by franchisees and motel staff not to report or respond to criminal activity including sex trafficking appropriately.

     e.  G6 Defendants continued to use policies, protocols, and practices that had been shown to lead to widespread trafficking.

     f.  G6 Defendants attracted traffickers by affirmatively creating a favorable venue where access was easy, risks of interference were low, and traceability was minimal.

     g.  Despite having specific knowledge of policies that would significantly reduce sex trafficking at its branded locations including Portland Motel 6, G6 Defendants declined to implement policies that would likely have the effect of reducing its sex

trafficking related profits or that would require publicly acknowledging the ongoing problem of sex trafficking at its properties.

h.  G6 Defendants willfully delayed taking obvious and apparent steps to stop facilitating sex trafficking, which they had the ability and responsibility to take sooner.

i.  G6 Defendants allowed traffickers to reserve rooms using cash, which provided relative anonymity and non-traceability.

j.  G6 Defendants provided traffickers with access to internet services in a manner that G6 Defendants knew or should have known would be used to facilitate trafficking by promoting commercial sex services online.

95.    The conduct of G6 in operating Portland Motel 6 facilitated widespread sex trafficking at the motels, including the trafficking activities of Jane Doe (CH)'s trafficker. The specific ways that G6 facilitated sex trafficking at Portland Motel 6 —including but not limited to their policies and practices that allowed for non-traceable payment methods, their policies and practices that allowed traffickers to rent rooms without providing their true identities, and their inadequate and inappropriate efforts at detection of and response to signs of sex trafficking— directly assisted and facilitated the activities of Jane Doe (CH)'s trafficker at Portland Motel 6 and the trafficking of Jane Doe (CH).

96.    Jane Doe (CH)'s trafficker was able to operate without interference and without making significant effort at a concealment during repeated visits to Portland Motel 6 over an extended period because G6 adopted, implemented, enforced, and used policies and practices that facilitated sex trafficking and minimized the risk of detection and traceability.

97.     Although G6 knew or should have known that franchisee used its "boots on the ground" role at Portland Motel 6 to facilitate sex trafficking, G6 facilitated, assisted, and supported Franchisee in continuing to do so. G6 had numerous tools and options available to respond to the ongoing facilitation of sex trafficking at Portland Motel 6, both through options for disciplining and controlling Franchisee and through their own ability to make relevant operational changes. Instead, G6 elected to continue lending the perceived legitimacy of its brand and its own direct operational involvement to a motel that continued to operate in a way that facilitated widespread sex trafficking.

98.     G6's acts and omissions, which were motivated by a single-minded focus on profit maximization, showed serious indifference to and callous disregard for the rights of sex trafficking victims, including Jane Doe (CH).

99.     G6 knew that sex trafficking causes immeasurable harm to victims and, nonetheless, knowingly or recklessly engaged in a longstanding pattern of conduct that generated revenue by facilitating that trafficking.

**VIII.  Defendants' Ventures at Portland Motel 6**

100.    Defendants each benefited from use of Portland Motel 6 for sex trafficking. Jane Doe (CH)'s trafficker and other traffickers rented rooms at Portland Motel 6 and used the motel to harbor, maintain, and provide victims for commercial sex, including Jane Doe (CH). When these traffickers rented rooms, both Franchisee, G6, and the trafficker received financial benefits. All were necessary parties to the venture.

101.    Franchisee generated revenue every time a sex trafficker rented a room at Portland Motel 6, both from room rental fees and from fees for other motel services.

102.    Each G6 Defendant generated substantial income from direct operations of motels such as Portland Motel 6. In exchange for providing the services described above, G6 received a share of the revenue from room rentals collected at each Motel 6. The fees generated by G6 are primarily based on gross room rentals; therefore, G6's revenue increased with each room rental at Portland Motel 6. Revenue generated from rooms rented at Portland Motel 6 was distributed among the G6 Defendants, with each benefiting from each rental of a motel room.

103.    G6 also benefited from sex traffickers' frequent use of Portland Motel 6 because this regular and routine use of the motels increased the motel occupancy rate, and an increase in the motel occupancy rate resulted in several benefits for G6, including that this assisted them in obtaining financing and helped them market franchising opportunities to potential franchisees.

104.    G6 also benefited through data collection from the sex traffickers' frequent use of Portland Motel 6's Wi-Fi. The traffickers, among other uses, used Portland Motel 6's Wi-Fi to post sex advertisements. This data results in several benefits for G6, including but not limited to the optimization of marketing, which results in greater financial benefits for G6.

105.    As more fully described above, G6 and Franchisee knowingly benefited from participating in a venture with sex traffickers who regularly operated at Portland Motel 6, including Jane Doe (CH)'s sex trafficker ("Venture 1").

106.    Both G6 and Franchisee participated in Venture 1 through a continuous business relationship with these sex traffickers. The traffickers developed a continuous business relationship with Portland Motel 6, and both G6 and Franchisee. participated in this ongoing business relationship through their respective roles at Portland Motel 6 (as further described above) in motel operations. This continuous business relationship involved mutual pursuit of benefit. G6 Defendants and Franchisee generated revenue from renting the rooms to traffickers who, in turn,

used the rooms to generate revenue from the illegal sex trafficking operations. This continuous business relationship developed as:

    a.  Motel staff developed familiar relationships with these traffickers.

    b.  Franchisee and G6 facilitated and enabled sex trafficking in the ways described in the above Complaint.

    c.  G6 Defendants and Franchisee allowed traffickers to take steps that would minimize their traceability to law enforcement, such as accepting cash payments and not requiring identification from appropriate parties.

    d.  These traffickers developed an understanding that motel policies and practices would minimize their risk of detection and traceability.

    e.  These traffickers developed an understanding that motel staff would turn a blind eye and thus were able to operate without diverting time and resources to avoid interference by motel staff.

    f.  These traffickers repeatedly returned to this same motel because of an understanding that it was a venue that would enable and facilitate their sex trafficking operation.

107.    Franchisee participated in the continuous business relationship with these traffickers through their direct "boots on the ground" role at Portland Motel 6. As further described above, G6 directly participated in this business relationship through their central role in room reservations and through their intimate involvement in aspects of motel operations related to the detection of and response to sex trafficking.

108.    This continuous business relationship facilitated, assisted, and supported the traffickers' illegal sex trafficking activities, including the trafficking of Jane Doe (CH). G6 and

Franchisee not only provided these traffickers with a physical space (harboring) but also with the cover of a legitimate business as a venue where they could profit from sexual exploitation without significant risk of disruption by motel staff and with minimal risk of detection and traceability.

109.    G6 and Franchisee also allowed johns who were not registered motel guests to come and go freely without any need to identify themselves within Portland Motel 6. This helped the traffickers to attract business from sex buyers and to minimize risks of detection and traceability. The conduct of both Franchisee and G6 facilitated trafficking at Portland Motel 6.

110.    G6 and Franchisee knew or should have known that Venture 1 was engaged in violations of the TVPRA because victims were being harbored, maintained, provided, and exploited at Portland Motel 6 by traffickers including Jane Doe (CH)'s trafficker.

111.    In ways described more fully above, G6 Defendants and Franchisee also knowingly benefited from participating together in a motel-operating venture at Portland Motel 6 that facilitated widespread sex trafficking, including the trafficking of Jane Doe (CH) (hereinafter "Venture 2").

112.    Venture 2 is a commercial venture that resulted from a longstanding business relationship between Franchisee and G6 that centered on operation of Portland Motel 6. This undertaking involved shared goals of maximizing gross room revenue and increasing room occupancy rates.

113.    Franchisee and G6 Defendants each participated in Venture 2 through their respective roles in motel operations as further described above. Each of these Defendants were directly involved in aspects of operations that facilitated sex trafficking at Portland Motel 6 and continued to operate the motel in the same manner despite actual or constructive knowledge that this was facilitating sex trafficking.

114.    There were TVPRA violations within the scope of Venture 2 because Portland Motel 6 was used to harbor, maintain, provide, and exploit many trafficking victims, including multiple victims of Jane Doe (CH)'s trafficker and Jane Doe (CH) herself. There were also TVPRA violations with the scope of Venture 2 through Franchisee's violations of 18 U.S.C. §1591(a) as a perpetrator.

115.    Both Franchisee and G6 knew or should have known that there were TVPRA violations within the scope of Venture 2 based on the obvious "red flags" associated with the trafficking activities of Plaintiff's trafficker and other traffickers at Portland Motel 6.

116.    G6 also knew or should have known that there were TVPRA violations within the scope of Venture 2 based on the role of Franchisee in facilitating widespread sex trafficking, including by Jane Doe (CH)'s trafficker as further described above. Despite this, G6 continued to assist and facilitate these violations through their ongoing participation in this commercial venture with Franchisee.

## IX.    Franchisee and the Staff at Portland Motel 6 Acted as Actual Agents of G6.

117.    G6 is vicariously liable for the acts, omissions, and knowledge of Franchisee and motel staff, which acted as G6's agents or subagents when operating Portland Motel 6.

118.    G6 subjected and retained the right to subject Franchisee to detailed requirements regarding the operation of Portland Motel 6. These detailed requirements came from written agreements, manuals, policies, protocols, directives, and mandates that G6 imposed through its ongoing control of motel operations.

119.    G6 obscured the full extent of control it exercises over Franchisee by treating these manual, policies, and directives as confidential and proprietary and guarding against public disclosure. Upon information and belief, the requirements that G6 imposed on Franchisee:

a. Did not merely identify quality or outcome standards but instead specifically controlled the means, methods, and tools Franchisee used at Portland Motel 6, such as telling motel staff step-by-step how to perform tasks at the motel and mandating that Franchisee use tools and products selected and controlled by G6.

b. Covered virtually all aspects of motel operations, including internal operating functions, such as human-resources issues and accounting and finance practices.

c. Dictated the specific ways that Franchisee and motel staff were required to carry out day-to-day functions.

d. Required the use of G6's owned, operated and controlled reservation and operation systems software and hardware.

e. Significantly exceeded what was necessary for G6 to protect its trademarks.

120.    In addition to the ways described above, G6 exercised and reserved the right to exercise systemic and pervasive control over Franchisee's day-today operation of Portland Motel 6, including the following ways:

a. G6 Defendants required Franchisee and management of franchised motels to participate in mandatory training programs, both during onboarding and on an ongoing basis. This training covered all aspects of motel operations, including aspects of motel operations that go significantly beyond what would be necessary for G6 Defendants to protect their registered trademarks.

b. G6 Defendants provided training for motel management and select motel staff on-site at locations selected by the G6 Defendants.

c. G6 Defendants required all motel staff to participate in training it created through an online learning platform it controlled and maintained.

d.  G6 Defendants controlled training provided by Franchisee to motel staff by dictating the content of that training, providing required content for that training, and dictating the training methods used.

e.  G6 Defendants retained sole discretion to determine whether all training had been completed satisfactorily.

f.  For certain products and services that Franchisee was required to purchase to operate Portland Motel 6, G6 Defendants designated approved vendors and prohibited Franchisee from purchasing goods and services from anyone other than an approved vendor.

g.  G6 Defendants required Franchisee to sign a technology agreement governing the terms under which Franchisee must procure and use technical services and software while operating the subject Motel 6s. Franchisee was required to install, and use certain brands, types, makes, and/or models of hardware, software, peripheral equipment, and support services to perform internal operating functions at the motel.

h.  G6 Defendants set required staffing levels for Portland Motel 6.

i.  G6 Defendants established detailed job descriptions for all positions at Portland Motel 6 and drafted numerous, detailed policies that referenced these positions and dictated which positions must perform which tasks and how they must do so.

j.  G6 Defendants set requirements for the hiring process used by Franchisee and oversaw employee discipline processes and termination decisions.

k.  G6 participated in the hiring, disciplining, and terminating motel management and employees.

l.  G6 participated in setting employee wages and salaries for motel staff.

m.  G6 Defendants provided benefits for employees of franchised motels.

n.  G6 Defendants required Franchisee to use a customer resource management program maintained and operated by G6 Defendants.

o.  G6 required Franchisee to participate in mandatory centralized services for day-to-day operation of Portland Motel 6.

p.  G6 Defendants controlled channels for guests to report complaints or provide feedback regarding Portland Motel 6 and directly participated in the response and / or supervised and the response to customer complaints or other feedback. G6 Defendants retained the right to provide refunds or other compensation to guests and to require Franchisee to pay associated costs.

q.  G6 Defendants generated reports and analysis of guest complaints and online reviews for Portland Motel 6.

r.  G6 required Franchisee to use its revenue management system, through which it dictated pricing and strategies to maximize revenue, and which gave it direct ability to supervise day-to-day operations of Portland Motle 6 through direct access to the system.

s.  G6 set and controlled room rates and discounts.

t.  G6 Defendants required Franchisee to use a Guest Relations Application owned, operated, and maintained by G6 Defendants to manage all guest data and information. G6 Defendants could use the backend of this system to analyze data and generate reports.

u. G6 Defendants set detailed requirements for insurance that Franchisee must purchase and retained the right to purchase insurance for Franchisee and to bill Franchisee directly for that insurance if the G6 Defendants determined that Franchisee have not purchased adequate insurance.

v. G6 Defendants regularly audited the books and records of Franchisee.

w. G6 Defendants conducted frequent and unscheduled inspections of Motel 6 and Studio 6 properties, including Portland Motel 6.

x. G6 Defendants retained the right to issue fines, require additional training, to impose and supervise implementation of detailed corrective action plans, and to take other steps up to and including termination of the franchising agreement if Franchisee violated any of the G6 Defendants' detailed rules, expectations, protocols, or policies, including those that governed day-to-day operations of Portland Motel 6.

y. G6 Defendants controlled all marketing for Portland Motel 6 and prohibited Franchisee from maintaining any online presence unless specifically reviewed and approved by G6 Defendants.

z. G6 Defendants imposed detailed recordkeeping and reporting requirements on Franchisee regarding virtually all aspects of motel operations.

aa. G6 exercised or retained control over Franchisee's day-to-day accounting and banking practices.

bb. G6 required Franchisee and motel staff to implement a data system that gave G6 real-time information on that it can monitor on a day-to-day basis.

    cc. G6 Defendants supervised and controlled day-to-day operations of Portland Motel 6 through detailed information and extensive reports that it obtained through the property management system and other software systems it required Franchisee to use.

    dd. G6 Defendants retained the virtually unlimited right to revise policies or adopt new requirements for the day-to-day aspects of motel operations.

121.    As further described above, G6 specifically retained and exercised control over the aspects of motel operations at Portland Motel 6, but also the franchised operations at Portland Motel 6, that caused or contributed to Jane Doe (CH)'s harm, including but not limited to:

    a.   reservations of rooms;

    b.  relevant policies (including payment method accepted, identification requirements, and motel access for individuals who are not registered motel guests);

    c.  motel security;

    d.  employee training;

    e.  guest and motel staff reporting of security issues; and

    f.  detection of and response to suspected sex trafficking.

122.    G6 had the right to exercise detailed, day-to-day control over and involvement in these areas. They also regularly and closely monitored these areas.

123.    G6 had the right to and did enforce control over Franchisee through various methods, including:

    a.  the right to conduct detailed inspections of Portland Motel 6;

    b.  monitoring or auditing Franchisee for compliance with policies and expectations;

    c.   directing Franchisee to take specific steps to come into compliance with detailed and exacting standards regarding day-to-day operations;

    d.   mandating training and education for Franchisee and / or motel staff;

    e.   employing consultants or field agents to become involved in the day-to-day operations of franchised motels;

    f.   the right to impose fines or penalties;

    g.   the right to impose additional conditions on Franchisee or to restrict or limit its right to provide goods and services; and

    h.   the right to terminate the franchise agreement for failure to comply with policies that govern the means and methods used for day-to-day operations.

**X.    G6 Defendants are jointly responsible for the trafficking of Jane Doe (CH).**

124.    Upon information and belief, each of the G6 Defendants, all of whom are corporate affiliates subject to common ownership and control, participated in a joint venture or integrated enterprise with one another regarding the operation, control, and franchising of Portland Motel 6. This involved a common enterprise, profit-sharing, a community of interests, and joint rights of control and management. They shared office space, employees, management, and policies. Thus, the G6 Defendants are vicariously liable for the actions of one another regarding the operation, franchising, and control of Portland Motel 6.

125.    Upon information and belief, operation of Portland Motel 6 was part of a single unified operation by the G6 Defendants. Upon information and belief, all G6 Defendants shared a common parent company, were subject to joint control, and operated as an integrated enterprise and/or as alter-egos. Upon information and belief, G6 Defendants acted jointly to own, operate,

control, manage, and supervise Portland Motel 6. As an integrated enterprise and/or joint venture, the G6 Defendants were separately and jointly responsible for compliance with all applicable laws.

## CAUSES OF ACTION—SEX TRAFFICKING UNDER THE TVPRA

126.    Jane Doe (CH) incorporates all other allegations.

**I.    Cause of Action: Perpetrator liability under 18 U.S.C §1595(a) based on violation of 18 U.S.C §1591(a) (Franchisee)**

127.    Jane Doe (CH) is a victim of sex trafficking within the meaning of § 1591 and 1595(a) and is thus entitled to bring a civil action under 18 U.S.C §1595(a) against the "perpetrator" of any violation of the TVPRA.

128.    Franchisee is a perpetrator within the meaning of 18 U.S.C §1595(a) because:

i.    it knew about or was willfully blind to the activity leading to Jane Doe (CH)'s trafficking because they directly observed the obvious "red flags" of this trafficking activity;

j.    it violated 18 U.S.C §1591(a)(1) when, through the acts and omissions described throughout this Complaint, they harbored individuals (including Jane Doe (CH) knowing or in reckless disregard of the fact that the victims would be caused, through force, coercion, or fraud, to engage in commercial sex acts while at Portland Motel 6.

k.    it violated 18 U.S.C §1591(a)(2) when, through the acts and omissions described throughout this Complaint, they knowingly received financial benefit by knowingly assisting, supporting, or facilitating a venture that trafficked victims including Jane Doe (CH).

**II.    Cause of Action: Beneficiary Liability under §1595 (a) of the TVPRA (All Defendants).**

129.    Jane Doe (CH) is a victim of sex trafficking within the meaning of 18 U.S.C. §§ 1591 and 1595(a) and is thus entitled to bring a civil action under the "beneficiary" theory in 18 U.S.C. §1595(a) against anyone who knowingly benefited from participation in a venture that the person knew or should have, with reasonable diligence, known was engaged in a violation of the TVPRA. Jane Doe (CH) is a victim of sex trafficking under 18 U.S.C. §§ 1591 and 1595(a) and is thus entitled to bring a civil action against any beneficiary who knowingly benefited from participation in a venture that the beneficiary knew or should have, with reasonable diligence, known was engaged in a violation of the TVPRA.

130.    All Defendants are liable as beneficiaries under 18 U.S.C. § 1595(a).

131.    **Venture 1:** Through acts and omissions more fully described throughout this Original Complaint, G6 and Franchisee received a financial benefit from participating in a venture with Jane Doe (CH)'s sex trafficker and other traffickers who regularly operated at Portland Motel 6:

    a.    Venture 1 resulted from the development of a continuous business relationship between these traffickers and Portland Motel 6, which formed when G6 and Franchisee continued renting the trafficker motel rooms despite the obvious "red flags" of his sex trafficking activity and created an environment at Portland Motel 6 that facilitated his trafficking activities.

    b.    G6 and Franchisee each directly participated in this ongoing business relationship through their respective roles in motel operations—and specifically those aspects of operations that facilitated sex trafficking—as described above.

c. Through their participation, G6 and Franchisee facilitated and supported the activities of the sex trafficker of Jane Doe (CH) and other traffickers at Portland Motel 6.

d. G6 and Franchisee benefited from their participation in this venture because they received increased revenue and other benefits described above when rooms at Franchisee were rented to traffickers, including Jane Doe (CH)'s trafficker.

e. This venture violated the TVPRA through the conduct of the traffickers who repeatedly harbored, maintained, provided, and exploited victims, including Jane Doe (CH), at Portland Motel 6.

f. G6 and Portland Motel 6 knew or should have known that Venture 1 was engaged in violations of the TVPRA based on the "red flags" associated with the illegal activities of Jane Doe (CH)'s trafficker and other traffickers regularly operating at Portland Motel 6 and because this trafficking would have been detected if they had exercised ordinary prudence.

132. **Venture 2:** Through the acts and omissions more fully described above, G6 and Franchisee also participated together in a commercial motel-operating venture that facilitated widespread sex trafficking at Portland Motel 6.

a. Venture 2 is a commercial venture that resulted from the business relationship between G6 and Franchisee operating Portland Motel 6 for the mutual purpose of maximizing revenue, including gross room revenue.

b. Franchisee participated in this venture by using their on-the-ground role to operate Portland Motel 6 in a way that they knew or should have known was facilitating sex trafficking.

   c.  G6 participated in this venture by

      i.  continuing the ongoing business relationship with Franchisee despite actual or constructive knowledge the motel was facilitating sex trafficking;

      ii.  directly involving themselves in and supporting aspects of motel operations that they knew or should have known were facilitating trafficking at the motel in ways described above; and

      iii.  continuing to lend the perceived legitimacy of their brand and provide marketing services for Portland Motel 6 after they knew or should have known the venture was engaged in violations of the TVPRA.

   d.  G6 and Franchisee benefited from participating in Venture 2 as each derived revenue and other benefits from each room rented to a sex trafficker, including the rooms rented to the trafficker of Jane Doe (CH).

   e.  Venture 2 violated the TVPRA through the widespread sex trafficking that occurred at Portland Motel 6 as victims—including Jane Doe (CH)—were harbored, maintained, provided, and exploited at Portland Motel 6. This venture also violated the TVPRA through the conduct of Franchisee, who violated 18 U.S.C. §1591(a) as perpetrators.

   f.  G6 and Franchisee knew or should have known that this motel-operating venture was facilitating sex trafficking, including the activities of the trafficker of Jane Doe (CH).

## III.  Cause of Action: Vicarious Liability for TVPRA Violations (G6).

133.   G6 Defendants are vicariously liable for the TVPRA violations of Franchisee and motel staff, who acted as G6's actual agents.

- 62 -

134.    An agency relationship existed between G6 and Franchisee because, through the acts and omissions described more fully above, G6 exercised and retained the right to exercise pervasive control over Franchisee and their operation of Portland Motel 6, including the means and methods they used and their day-to-day operations of the motel.

135.    An agency relationship also existed between G6 and Franchisee because G6 retained and exercised control over the specific aspects of operations that caused Jane Doe (CH)'s injuries and / or damages as described above.

136.    Franchisee    committed    TVPRA    violations—as    both    beneficiaries    and perpetrators—within the scope of its agency relationship with G6. Specifically, it committed these violations while renting rooms at Portland Motel 6 and operating Portland Motel 6 in a manner that facilitated sex trafficking.

137.    Jane Doe (CH) further alleges that G6 Defendants are vicariously liable for the acts and omissions of the staff at Portland Motel 6 as a direct or joint employer. In the ways described throughout this Complaint, G6 controlled the terms and conditions of their employment. As a result, G6 and Franchisee are the joint employers of the motel staff at Portland Motel 6.

138.    Moreover, each of G6 Defendants is liable for the acts and omissions of the other G6 Defendants with respect to the operation and franchising of Portland Motel 6. On information and belief, G6, who were corporate affiliates subject to common ownership and control and who shared employees and a single corporate headquarters, operated as a joint venture engaged in profit sharing and subject to mutual control regarding the operation of Portland Motel 6. They operated as a single integrated enterprise and as alter-egos and / or agents of one another with respect to operation of Portland Motel 6, making them vicariously liable for one another.

**TOLLING OF LIMITATIONS**

- 63 -

139.    To the extent Defendants assert an affirmative defense of limitations, Jane Doe (CH) invokes the discovery rule. At the time she was harmed and through at least through 2017, Jane Doe (CH) was under the coercion and control of her trafficker who drugged her, threatened her, psychologically abused her, exercised coercive control over her, and severely restricted her freedom. As a result, Jane Doe (CH) lacked the information and capacity to understand her injuries and their legal causes.

140.    Thus, Jane Doe (CH) did not discover and could not reasonably have discovered the legal cause of her injury more than ten years before she filed this lawsuit. While she was under the control of her trafficker, Jane Doe (CH)—through no fault of her own—lacked the information and understanding to bring a claim because she did not know both her injury and the cause of her injury. This lack of information was a direct result of Jane Doe (CH) being kept under the control, coercion, and manipulation of her trafficker, which Defendants facilitated.

141.    At the time Jane Doe (CH) was harmed, she did not know that she was the victim of human trafficking as that term is defined by law, that her injury arose from being "trafficked" at Defendants' motel or that she was a person "trafficked", much less that she was the "victim" of a legal venture involving defendants, and she did not discover and was not in a position to discover the legal cause of her injury, more than ten years before suit was filed.

142.    To the extent Defendants assert an affirmative defense of limitations, Jane Doe (CH) invokes the doctrine of equitable tolling because, as a result of being a victim of trafficking, Jane Doe (CH) faced extraordinary circumstances, which arose through no fault of her own, that prevented her from filing a lawsuit, and those circumstances did not end more than 10 years before Jane Doe (CH) filed this lawsuit.

143.    While under the control of her trafficker through at least 2017, Jane Doe (CH) did not have the freedom to investigate her claims, to identify those responsible, or to seek legal representation necessary to pursue her legal rights. Jane Doe (CH) could not have pursued her claims while under the active control of her trafficker despite the exercise of ordinary diligence.

144.    To the extent Defendants assert an affirmative defense of limitations, Jane Doe (CH) also invokes the continuing violation doctrine because this lawsuit arises out of a pattern of continuous and ongoing tortious conduct by Defendants, individually and in concert, at Portland Motel 6.

145.    Jane Doe (CH) was subject to continuous trafficking through 2017, which is not more than 10 years before Jane Doe (CH) filed this lawsuit.

146.    This continuous trafficking resulted from Defendants' facilitation of trafficking at Portland Motel 6 and Defendants' ongoing ventures with one another and with criminal traffickers at that motel.

## DAMAGES

147.    Jane Doe (CH) sustained legal damages as a result of being the victim of sex trafficking under the TVPRA.

148.    Defendants are joint and severally liable for all past and future damages sustained by Jane Doe (CH).

149.    Jane Doe (CH) is entitled to be compensated for personal injuries and economic damages, including:

    a.  Actual damages (until trial and in the future)

    b.  Incidental and consequential damages (until trial and in the future);

    c.  Mental anguish and emotional distress damages (until trial and in the future);

    d.  Necessary medical expenses (until trial and in the future);

    e.  Life care expenses (until trial and in the future);

    f.  Physical pain and suffering (until trial and in the future);

    g.  Physical impairment (until trial and in the future);

    h.  Emotional impairment (until trial and in the future);

    i.  Exemplary/Punitive damages;

    j.  Attorneys' fees; and

    k.  Costs of this action.

    l.  Pre-judgment and all other interest recoverable.

### JURY TRIAL

150.    Jane Doe (CH) demands a jury trial on all issues.

### RELIEF SOUGHT

151.    **WHEREFORE**, Jane Doe (CH) prays that this case be set for trial before a jury and that, upon a final hearing of the cause, judgment be entered for Jane Doe (CH) against all Defendants jointly and severally for the actual, compensatory, and punitive damages as the evidence may show, and the jury may determine to be proper, together with the costs of suit, prejudgment interest, post-judgment interest, and such other and further relief to which Jane Doe (CH) may, in law or in equity, show herself to be justly entitled.

                    **RESPECTFULLY SUBMITTED,**

                    ***/s/ Jason M. Byrd***
                    Jason M. Byrd (24036303)
                    The Byrd Law Firm
                    448 Orleans Street
                    Beaumont, Texas 77702
                    T: (409) 924-0660

E: jason@txbyrd.com

## **CERTIFICATE OF SERVICE**

I certify that a true and correct copy of ***the foregoing*** has been served on counsel of record pursuant to the Federal Rules of Civil Procedure on July 1, 2025.

***/s/ Jason M. Byrd***